82 Cal.App.3d 191 (1978)
146 Cal. Rptr. 880
COUNTY OF FRESNO, Petitioner,
v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent; DONNIE ROY O'NEAL et al., Real Parties in Interest.
Docket No. 3902.
Court of Appeals of California, Fifth District.
June 26, 1978.
*192 COUNSEL
Robert M. Wash, County Counsel, Max E. Robinson, Assistant County Counsel, and J. Wesley Merritt, Deputy County Counsel, for Petitioner.
No appearance for Respondent.
Henry & Missirlian and John Haig Missirlian for Real Parties in Interest.
Betsy Temple, Howard K. Watkins, William H. Leifer, Janice Pearson, Paul Bell, Stephen J. Perrello, Jr., Michael Satris and Morton P. Cohen as Amici Curiae on behalf of Real Parties in Interest.
OPINION
BROWN (G.A.), P.J.
Real party in interest Donnie Roy O'Neal is an indigent imprisoned in a state correctional facility and is a defendant in three civil actions for wrongful death pending in Fresno County.
*193 Fresno County Legal Services, Inc., a publicly funded pro bono publico legal services organization, is representing a codefendant in the same civil actions and cannot represent O'Neal because of a potential conflict of interest between O'Neal and the client for whom it is providing legal services.
The superior court appointed real party in interest John Haig Missirlian, an attorney engaged in private practice, to represent O'Neal. He accepted the appointment and undertook the representation. Thereafter Attorney Missirlian petitioned the superior court for attorney's fees and costs. The court awarded $500 attorney's fees, denominated a retainer, and $100 costs for "all services required to prepare this case for trial" and ordered payment out of the Fresno County general fund. (1a) There was no evidence presented that the County of Fresno has appropriated funds for this purpose nor is there any argument presented or authority cited that the county has been authorized by the Legislature to do so.
Contending that in the absence of legislative authority and an appropriation of funds the superior court is without authority or power to order the payment of attorney's fees and costs, the County of Fresno seeks a writ of mandate directing the superior court to vacate its order.
In Payne v. Superior Court (1976) 17 Cal.3d 908 [132 Cal. Rptr. 405, 553 P.2d 565], the Supreme Court held that an indigent prisoner who is sued in a private civil action is constitutionally entitled to "a meaningful opportunity to be heard" (at p. 927) in the action, which may constitutionally require court appointment of counsel to represent him.[1] The majority of the court in Payne saw the combined effect of (a) lack of opportunity of a prisoner to appear personally in court to protect his property interests and (b) inability of an indigent prisoner to obtain counsel as a denial to the indigent prisoner sued in a civil case of meaningful access to the courts, and this the majority held violated the indigent prisoner's rights under the due process and equal protection clauses of both the state and federal Constitutions. (Payne v. Superior Court, supra, 17 Cal.3d at pp. 913-923.)
*194 The issue in Payne arose when the petitioner sought to be relieved from a default judgment taken against him while he was a prisoner, indigent and unrepresented. (2a) The question of compensation of and costs for appointed counsel was not squarely before the court. However, the court made definitive pronouncements upon the subject of compensation at two separate places. Footnote 6 at page 920 reads: "The state also apparently assumes that if this court orders counsel appointed in certain cases, it will mandate that counsel be paid from public funds. We do not assert such power. If and how counsel will be compensated is for the Legislature to decide. Until that body determines that appointed counsel may be compensated from public funds in civil cases, attorneys must serve gratuitously in accordance with their statutory duty not to reject `the cause of the defenseless or the oppressed.' (Bus. & Prof. Code, § 6068, subd. (h).)" Again, at pages 923-924, the court said: "Whether counsel will be drawn from the ranks of legal aid attorneys, other public or privately funded lawyers serving the disadvantaged, public defenders if so authorized to act, or the private bar, is a question that we leave to the sound discretion of trial courts. We recognize, of course, that funds for payment for the services of the appointed attorneys are unavailable until such time as authorized by the Legislature. (Fn. 6, ante.)" It is apparent from the context of the Supreme Court's comments that the issue of compensation was discussed by counsel and was a consideration entering into the majority's decision,[2] probably in anticipation of the issue arising upon further proceedings in the trial court. (3) Because the issue was not necessary to the decision in a narrow sense, real parties in interest argue that what the Supreme Court said was dicta and need not be followed. We do not agree. Dicta are not to be ignored. Dicta may be highly persuasive, particularly where made by the Supreme Court after that court has considered the issue and deliberately made pronouncements thereon intended for the guidance of the lower court upon further proceedings. (Paley v. Superior Court (1955) 137 Cal. App.2d 450, 460 [290 P.2d 671].)
(2b) This view as to the compelling effect of the Payne language denying compensation to appointed counsel for indigent defendants in civil cases is reenforced by the Supreme Court's subsequent decision in *195 Jara v. Municipal Court (1978) 21 Cal.3d 181 [145 Cal. Rptr. 847, 578 P.2d 94]. That case held that the trial court is not constitutionally compelled to appoint an interpreter at the expense of the county or court for an indigent non-English speaking party to a civil action. Among other statements, the court said:
"In Ferguson [Ferguson v. Keays (1971) 4 Cal.3d 649 (94 Cal. Rptr. 398, 484 P.2d 70)] we did not reach the question whether indigents must be given funds to pay third party charges in civil cases. [Citation.] Subsequent cases have refused to require counties to provide indigent civil litigants with counsel or with appellate transcripts. [Citations.]
"Providing for appointed counsel for indigent prisoner defendants in Payne v. Superior Court (1976) 17 Cal.3d 908 [132 Cal. Rptr. 405, 553 P.2d 565], this court expressly pointed out that we do not possess the power to require expenditure of public funds for the purpose. Rather, attorneys are expected to serve gratuitously as part of their public responsibilities. [Citation.]" (At p. 184.)
Further, our independent review of the authorities in this and other states has failed to turn up a single case wherein a court has held that an indigent civil litigant is entitled to court-appointed counsel at public expense.[3][4]
*196 Moreover, even in the criminal arena California and the vast majority of other states have held that absent statutory authority appointed counsel for an indigent defendant has no right to compensation or costs by the public and that such denial does not violate any provision of the federal Constitution. (Rowe v. Yuba County (1860) 17 Cal. 61; Lamont v. Solano County (1874) 49 Cal. 158; Annot., Right of Attorney Appointed by Court for Indigent Accused to, and Court's Power to Award, Compensation by Public, in Absence of Statute or Court Rule (1968, 1977 pocket pt.) 21 A.L.R.3d 819; Annot., Inherent Power of Court to Compel Appropriation or Expenditure of Funds for Judicial Purposes (1974, 1977 pocket pt.) 59 A.L.R.3d 569, 617-625.)[5] Certainly the position of an attorney at law in this regard can be distinguished from that of a plumber, a barber, a grocer, a clothing store owner or an automobile dealer. The practice of law is a professional privilege conferred by the state, one of the conditions of which is that the attorney not reject "the cause of the defenseless or the oppressed" (Bus. & Prof. Code, § 6068, subd. (h)). No such statutory or professional obligation attaches to those who perform the other services or engage in the businesses mentioned.
In the various cases in the criminal area discussing this subject the attack upon the doctrine that an attorney should serve free as part of his professional duty is grounded upon contentions that such a doctrine deprives the attorney of property without due process of law and constitutes involuntary servitude. The cases also discuss the contention that the court has the inherent power to order the payment of attorney's fees and expenses to assure the fulfillment of the indigent criminal defendant's due process and equal protection rights to adequate legal representation. Though the case at bench involves strictly private civil litigation, the identical issues are raised herein. While we are not unmindful of the serious burdens placed upon attorneys in fulfilling their statutory and professional obligation, we believe that the pronouncement of Payne that absent legislative authority counsel is not entitled to be compensated, followed by Jara, renders it unnecessary and inappropriate *197 that this intermediate appellate court launch upon an independent analysis of the arguments in support of petitioner's position. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450 [20 Cal. Rptr. 321, 369 P.2d 937].) If we are wrong in this regard, the Supreme Court, which penned the novel, innovative and expansive teachings of Payne, will give us, the litigants and the bar proper directions in this regard.
(1b) Let a peremptory writ of mandate issue directing the superior court to vacate and set aside its order dated February 7, 1978, authorizing and directing the payment of fees and costs to counsel for Donnie Roy O'Neal.
FRANSON, J.
I concur fully in the principal opinion. The question is not the economic needs or constitutional rights of lawyers  it is whether an indigent prisoner's constitutional right of access to the courts in a civil case will be significantly impeded if his counsel is not paid from public funds. Only if it is demonstrated that this is so does the right to compensation achieve a constitutional dimension. I submit that this is not the case.
Far more than the public realizes, the legal profession has responded magnificently over the years to the lawyer's ethical mandate "[n]ever to reject, for any consideration personal to himself, the cause of the defenseless or the oppressed." (Bus. & Prof. Code, § 6068, subd. (h).) Moreover, the State Bar Board of Governors recently has applied for a federal grant to provide civil legal assistance to indigent prisoners in California. If approved, the prison legal services program will be headquartered in San Francisco with eight field offices near prisons and will provide legal assistance to about 4,000 prisoners annually. (Los Angeles Daily Journal (June 12, 1978) p. 1, col. 7.) Thus, there is no compelling need to create a constitutional power in the court to order payment to counsel from public funds. It remains solely a matter for the Legislature.
Furthermore, the impact on the public treasury should be considered. If a court has the constitutional power to order compensation to counsel for defending indigent prisoners in civil actions, it will be just a matter of time before counsel will be entitled to payment from public funds for initiating civil actions on behalf of prisoners. (See Pen. Code, § 2601, subd. (e).) If indigent prisoners are entitled to counsel paid from public funds, why are indigent citizens of good standing in the community not also entitled to such counsel? Such far-reaching decisions involving the *198 expenditure of public monies should be made by our elected representatives and not the courts.
HOPPER, J.
I respectfully dissent.
I would hold that in those limited situations, such as this, where private counsel is appointed to represent an indigent prisoner pursuant to the holding of Payne (Payne v. Superior Court (1976) 17 Cal.3d 908 [132 Cal. Rptr. 405, 553 P.2d 565]), the attorney is entitled to reasonable compensation for legal services and reimbursement of expenses to be fixed by the trial court; that failure to provide such payment from public funds violates the due process and equal protection clauses of the federal and state Constitutions, as well as article I, section 19, of the California Constitution (taking property without just compensation); and that the court has inherent power to order payment from public funds.
The California Supreme Court said in Payne, at page 924: "All we hold is that denial of appointed counsel to an indigent prisoner, when no other relief will preserve his right of access to the courts, is constitutionally impermissible." And again at page 927: "All we decide is that when a prisoner is threatened with a judicially sanctioned deprivation of his property, due process and equal protection require a meaningful opportunity to be heard. How that is to be achieved is to be determined by the exercise of discretion by the trial court."
Thus, the specific holding of Payne does not bind us. I am aware that the dicta of the California Supreme Court (such as found in Payne and again in Jara v. Municipal Court (1978) 21 Cal.3d 181 [145 Cal. Rptr. 847, 578 P.2d 94] as referred to in the lead opinion) is generally highly persuasive. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 678, pp. 4591-4593.)
With all due respect, I am not persuaded by the dicta, particularly in the light of the facts of the instant case. No case or statutory law was cited in Payne in support of that dicta other than the Business and Professions Code (see infra).
A careful examination of the Payne amicus briefs,[1]Payne pleadings, and alternative writ that was issued by the Supreme Court in Payne, *199 discloses that no considered analysis was made of the compensation issue. A contention of the Attorney General in the motion for leave to intervene mentioned the enormous economic strain of appointed counsel, but the amicus brief subsequently filed did not discuss that issue or the issue of compensation (the amicus brief did make a reference to the expenditure of public funds allegedly being a violation of article XVI, section 6, of the Cal. Const. (a gift of public funds)). The return filed in Payne by the Los Angeles County Counsel referred, in passing, to a "publicly-paid" attorney, but there was no discussion on the compensation issue. Petitioner in Payne used the language "state-paid" counsel in the supplemental petition for writ of mandate, the points and authorities, and in argument, but there is no argument supporting the term; the same is true in regards to the amicus brief filed on behalf of the defendant in Payne.
The thrust of the controversy in Payne was on the "right to counsel." There simply was no written argument on the issue of compensation (and in particular about compensation when legal services were unavailable due to conflicts). The parties in Payne just assumed the compensation issue would be resolved as a matter of course. In short, the matter of payment from public funds was never fully briefed, fully argued, or fully considered by the parties.
I cannot agree that the Supreme Court has made a definitive ruling on the subject. The matter is still an open question. In such a situation, an intermediate appellate court should try to bring areas of legal uncertainty to light and sharpen the issues for ultimate consideration by the Supreme Court (see Witkin, Manual on Appellate Court Opinions (1977) § 40(b), p. 68). Consequently, I now turn to the merits and to a consideration of the right to compensation and to the right to reimbursement of expenses.[2] Because fundamental fairness runs throughout the constitutional provisions involved, I find no need to separately discuss each provision as applied to this case.
*200 Under the views of courts from other states, failure to pay compensation does not violate the constitutional prohibition of articles comparable to California Constitution, article I, section 19, or the due process clause, because there is no "taking." (See discussion in Note, The Indigent's "Right" to Counsel in Civil Cases (1975) 43 Fordham L.Rev. 989, 1002-1008.)
I believe that such a view is based on an illogical and impractical theory of no compensation for representation of an indigent being a condition of a license to practice law. That concept, in my opinion, is untenable in the first place, but becomes patently invalid when it is applied to out-of-pocket expenses attributable to an appointed case. From any vantage point, there is a "taking" within the due process clause. What if there are reasonable expenses required for investigation, or for experts on reconstruction of automobile collisions, or for other experts? Is counsel supposed to donate money for those items? In the instant case, the unreimbursed appointed counsel would be paying out of his own pocket considerable funds just for mileage to and from his office to the state prison (each round trip from counsel's office to the prison facility is approximately 120 miles). The court should order reimbursement of counsel for all reasonable expenses. (See State v. Second Jud. Dist. Ct. in and for Co. of Washoe (1969) 85 Nev. 241 [453 P.2d 421, 423].)
The law in this state since Rowe (Rowe v. Yuba County (1860) 17 Cal. 61) has been that in a criminal case in the absence of a statute an attorney is not entitled to compensation for representing an indigent person upon appointment by the court. (See also Hill v. Superior Court (1956) 46 Cal.2d 169, 172 [293 P.2d 10]; Lamont v. Solano County (1874) 49 Cal. 158, 159; Gibson v. County of Sacramento (1918) 37 Cal. App. 523, 525 [174 P. 935]; 38 Ops.Cal.Atty.Gen. 154 (1961); 36 Ops.Cal.Atty.Gen. 85 (1960); 26 Ops.Cal.Atty.Gen. 216 (1955).) However, I do not consider Rowe to be compelling authority upon which to base a denial of compensation in this case. The issue of inherent judicial power to order fees and costs was not even argued in Rowe. Nor was there a full discussion of all constitutional issues. Rowe itself said at page 63: "The duty imposed ... may, it is true, be carried to unreasonable length, so as to become exceedingly burdensome; but we have heard of no complaints of this character." Times and conditions have dramatically changed since 1860.
In my opinion, jurisdictions in the United States following the minority view are correct in holding that the appointment of counsel to serve without compensation is basically wrong. (Webb v. Baird (1854) 6 Ind. 13, *201 16-17; Hall v. Washington Co. (1850 Iowa) 2 G. Greene 473, 476; County of Dane v. Smith (1861) 13 Wis. 585, 588; Ferguson v. Pottawattamie County (1938) 224 Iowa 516 [278 N.W. 223, 224]; Carpenter and Another v. County of Dane (1859) 9 Wis. 274, 277; Blythe v. The State (1853) 4 Ind. 525; State v. Hilgemann (1941) 218 Ind. 572 [34 N.E.2d 129, 130]; Knox County Council v. State (1940) 217 Ind. 493 [29 N.E.2d 405, 408, 130 A.L.R. 1427]; Honore v. Washington State Bd. of Prison Terms & P. (1970) 77 Wn.2d 660 [466 P.2d 485, 496]; see also State v. Rush, 46 N.J. 399 [217 A.2d 441, 447]; Abodeely v. County of Worcester (1967) 352 Mass. 719 [227 N.E.2d 486, 489] (using a statute); compare Bedford v. Salt Lake County (1968) 22 Utah 2d 12 [447 P.2d 193, 194] and Ruckenbrod v. Mullins (1943) 102 Utah 548 [133 P.2d 325, 326, 144 A.L.R. 839]; see also Baird v. Attorney General (1977)  Mass.  [360 N.E.2d 288, 301] (fn. 20 purports to distinguish Payne as not involving the incarcerated, indigent defendant's assertion of a constitutional right).)
One of the difficulties in analyzing cases on this issue is the myriad of reasons for the particular decisions. Some opinions are based on statutes or constitutional provisions or court rules, or a combination thereof, and some on a concept of inherent power. Thus, the fact that a particular opinion is not based on one theory or another does not mean, for example, that that theory is nonexistent in the particular jurisdiction, but means only that that particular court was not required to consider that particular issue because of the existence of a constitutional provision, statute or court rule. All of the cases should be read with that caveat in mind.
To the lawyer, the legal profession is a means of livelihood and should be accorded no different treatment from any other employment. The lawyer owes a duty to the court, but he is not obligated to render free service to the public in all circumstances. The legal profession is steeped in tradition, and I would be the last to deny the importance of pro bono work on the part of private counsel. However, public service must be realistic and take the form of reduced compensation or the form of some social service without resulting in the lawyer being unable to have a reasonable opportunity to make a living for himself or herself and his or her respective family.
Attorneys have the obligation set out in the Business and Professions Code (§ 6068, subd. (h); see also ABA Code of Prof. Responsibility, EC 2-25 (lawyers obligated to provide free legal services to those unable to *202 pay reasonable fees)).[3] This duty of free representation arose at a time when social, economic and legal conditions were vastly different from those of today.
The attorney at the time of Rowe had virtually no overhead. "He did not have to purchase any complicated office equipment. His library expenses were almost nil. He had no staff to pay. Rent was low. There was no such thing as telephone, jet transportation, and all the other enormous expenses that every busy practitioner encounters today." (Hunter, Slave Labor in the Courts  A Suggested Solution (July-Aug. 1969) 74 Case & Com. 3, 8.) To make a decent living today, the attorney has to handle a tremendous number of cases  much more than was required at the inception of the rule of Rowe. Furthermore, expanding concepts in law have increased the volume of assignments, the complexity of the issues involved,[4] and a mushrooming of the duties involved in an appointed case.
A good example of the great burden placed on members of the legal profession in the criminal field was pointed out by then United States Senator Sam J. Ervin, Jr., in Uncompensated Counsel: They Do Not Meet the Constitutional Mandate (1963) 49 A.B.A.J. 435, 436. Ervin was advocating legislation on compensation for appointed counsel in the federal field and mourning the long number of years which had passed without legislative activity. He says at page 436: "In the 1959 House of *203 Representatives hearings the story was told of a lawyer in Wyoming who had long experience in criminal law and was in practice by himself. He was appointed to defend in a federal criminal case which involved ten days and three nights of actual trial time, plus considerable preparation. The Government presented 114 witnesses. For practical purposes the lawyer was required to close his office for six weeks. As a result, he was practically bankrupted." While there may have been some reason for the rule in the past, that reason is no longer valid. In Ervin's words (id.) "the lawyer himself should not fear indigency while defending the indigent." No valid reason compels our being held captive by an out-moded rule. Increased costs of malpractice insurance resulting, in part, from the increased complexity of cases has further added to the basic economic problems faced by lawyers. The burden of uncompensated work today can easily become intolerable. If a lawyer cannot realistically accept an uncompensated appointment without catastrophic results to his family, and no funded legal services group is available because (as here) there is a conflict of interest, the indigent prisoner will end up with either (1) no counsel, (2) counsel only because the particular appointee has independent means, (3) counsel with limited experience but willing to take the case, or (4) appointed counsel under a system of forced labor that would violate the constitutional prohibition against involuntary servitude (U.S. Const., 13th Amend., § 1; Cal. Const., art. I, § 6). Thus, the indigent's purported right to an attorney, which the California Supreme Court has said to be constitutionally required, in cases such as this one, becomes a mere paper right.
Reasonable people may disagree with Payne, but as an intermediate appellate court we are bound to follow its mandate. The dicta in Payne refers to the source of attorneys as being "... drawn from the ranks of legal aid attorneys, other public or privately funded lawyers serving the disadvantaged, public defenders if so authorized to act, or the private bar, ..." (17 Cal.3d 908, 923-924.) In those limited situations when there is no legal service organization available and, therefore, private counsel must be appointed, I believe that appointed counsel must be paid by public funds.[5]
*204 The remarks in Comment, The Uncompensated Appointed Counsel System: A Constitutional and Social Transgression (1972) 60 Ky.L.J. 710, at page 715, are appropriate.[6] The author of the comment points out:
"Just as it would seem that the services of a doctor, a plumber, or a barber are his `property' within the constitutional sense of the word it should logically follow that the services of a lawyer constitute his `property.' For just as a grocer, a clothing store owner, and an automobile dealer sell their goods, a doctor, a plumber, a barber, and a lawyer sell their services. It would be interesting to observe the uproar if an automobile dealer were required to give free cars to indigents or a barber were required to give free haircuts.
"... the attorney is deprived of equal protection of the laws when he is compelled to perform services without compensation while no other profession is so required to give its goods or services free of charge."[7]
There are no cases in California or elsewhere considering the subject of compensation as to civil matters. This is not only because Payne is so recent, but also for other reasons, including the following: (1) At early common law the problem could not even exist because the convicted felon lost his property to the state as part of his punishment.[8] (2) When this representation-compensation problem came up in the criminal field, the Legislatures enacted compensation statutes almost at once and before the problem had become exacerbated. (3) Life in earlier times was at an easier pace, and the demands for legal services were not so vocal or omnipresent. (4) The number of cases may be quite small in the civil *205 litigation field where prisoners are involved; admittedly, no empirical data has been presented on this point (see dis. opn. of Richardson, J., in Payne, supra, at p. 933; see also article based on a report (1973) of the Resource Center on Correctional Law and Legal Services, entitled Providing Legal Services to Prisoners (1974) 8 Ga.L.Rev. 363). (5) The rise of public or quasi-public legal services groups has reduced the demand on the lawyer, and when there is no conflict, they may be adequate. (See Ehrlich, Giving Low-Income Americans Minimum Access to Legal Services (1978) 64 A.B.A.J. 696, expressing a hope of the future of having two poverty lawyers for every 10,000 poor persons.)
Reasonable people may disagree with the appointment of counsel for a convicted felon, particularly when death is involved. However, the appointment is not based upon the felon being a "deserving person," but rather on the belief that the integrity of the judicial system itself requires representation under the circumstances. The issue is not whether the felon should or should not be represented, since the California Supreme Court has already decided that such representation is required, but whether an attorney should be compensated or be required to render free services. Thus, we cannot judge the compensation issue on the basis of the misdeeds of the felon, nor can we pass on the merits, if any, of a defense.
Once we accept the principle that, in certain limited circumstances, the court has the obligation to appoint counsel for an indigent prisoner in a civil case (as we must under the compulsion of Payne), it logically and naturally flows from that principle that the attorney appointed (unless he or she understandingly and knowingly waives compensation or falls in the category of being a part of a funded legal services group) must be compensated. Logically, the obligation to compensate necessarily arises out of the Payne decision, just as the obligation to compensate is found in other places by virtue of a specific statute. Compensation is implied from the very fact of appointment itself.[9]
As a matter of elementary fair play embodied in the concepts of due process and equal protection, the attorney should not be placed in the impossible position of being uncompensated. The individual practitioner should no longer be required to discharge a duty which constitutionally is *206 the burden of all. The Legislature should provide for this compensation as a social cost of the administration of our system of justice.
From time to time the contention is made that this is a matter for the Legislature because the Legislature can best conduct investigations to determine the extent of the need, the amount of funds required and the numerous factors involved, whereas courts can only deal with the problem on a case-by-case basis. (See, e.g., Board of Supervisors of George County v. Bailey (Miss. 1970) 236 So.2d 420, 423.) Such a contention fails to consider the facts of legal life today; the nature, number, complexity and size of litigation; the high cost of overhead; the importance of integrity of the judicial process; and the constitutional basis of the power to appoint which is present in cases such as this.[10]
I agree that in a democratic society the Legislature should be given the opportunity to develop a permanent solution for funding either by county or state.[11] However, under Payne, the appointment of counsel in these limited circumstances has constitutional underpinnings. Therefore, the judiciary should not shirk its responsibility to uphold the Constitution and should order payment of fees and expenses from county funds as was done here by the trial court. When the Legislature fails or refuses to act, I believe that the court is compelled to order compensation. I would hold that court-ordered compensation is constitutionally mandated when the appointment of private counsel is constitutionally mandated.
As a separate and independent basis, I would uphold the right to order compensation in this particular case as within the inherent power of the court to provide the necessary means for the administration of justice. This power has been upheld on many occasions in California and elsewhere. A constitutionally created court in California has implied powers that are necessary to enable it to properly and effectively exercise the judicial power granted by the California Constitution, article VI, section 1. (See People v. Sidener (1962) 58 Cal.2d 645, 656 [25 Cal. Rptr. 697, 375 P.2d 641] (dis. opn. of Schauer, J.); Sidener was overruled in *207 People v. Tenorio (1970) 3 Cal.3d 89, 91 [89 Cal. Rptr. 249, 473 P.2d 993], which agreed with the Sidener dissent by Justice Schauer on the nature of judicial power.) Thus, California courts have said:
"A court set up by the Constitution has within it the power of self-preservation, indeed, the power to remove all obstructions to its successful and convenient operation." (Millholen v. Riley (1930) 211 Cal. 29, 33 [293 P. 69].)
"Our courts are set up by the Constitution without any special limitation; hence the courts have and should maintain vigorously all the inherent and implied powers necessary to properly and effectively function as a separate department in the scheme of our state government." (Brydonjack v. State Bar (1929) 208 Cal. 439, 442 [281 P. 1018, 66 A.L.R. 1507].)
As the Supreme Court said in Nicholl v. Koster (1910) 157 Cal. 416, 423 [108 P. 302], referring to appointment of assistants for the court: "But if the legislature or the constitution should fail to provide such persons, a court invested with jurisdiction would have all the powers necessary to its convenient exercise and could appoint such assistants as might be required." (See also Arc Investment Co. v. Tiffith (1958) 164 Cal. App.2d Supp. 853, 856 [330 P.2d 305] (power to control and prevent abuse in the use of process "inherently `necessary to the orderly and efficient exercise of jurisdiction'"); Hart Bros. Co. v. County of L.A. (1938) 31 Cal. App.2d Supp. 766, 770 [82 P.2d 221] (power in absence of a statute to provide food and lodging for jurors); for a general discussion, in addition to the A.L.R. annotations (Annot. (1974) 59 A.L.R.3d 569) cited in the lead opinion, see Carrigan, Inherent Powers of the Court (National Judicial College (1973)).)
The orderly conduct of litigation in our society requires lawyers. As the Iowa Supreme Court said in Hall v. Washington Co., supra, 2 G. Greene 473, 476, in upholding reasonable fees for appointed counsel for indigents: "[R]easonable compensation ... is a necessary incident, otherwise the arm of the law will be too short to accomplish its designs."
I recognize that the inherent power of the judiciary is limited, as it should be, in a democratic society. Insofar as the Constitution permits, *208 courts should act in a spirit of cooperation in dealing with other branches of government in our tripartite system. The inherent power of the court is nonadjudicatory and relates solely to the administration of the business of the court. Justiciable matters are not included within its perimeters. Thus, this power is limited to such matters as are essential to the existence of the court and as are reasonably necessary to the orderly and efficient exercise of its jurisdiction (20 Am.Jur.2d, Courts, §§ 78, 79). I submit that ordering compensation of an appointed lawyer in this case comes within the narrow confines of the judicial power. Payment of compensation is necessary to the independence of both the legal profession and the judiciary. In the absence of a statute so providing, the court should order payment. Such an order is reasonably necessary "to protect the integrity of the judicial process." (Cf. Rosato v. Superior Court (1975) 51 Cal. App.3d 190, 210 [124 Cal. Rptr. 427]; see also Comment, California's Civil Appeal in Forma Pauperis  An Inherent Power of the Court (1972) 23 Hastings L.J. 683.) Otherwise it would rend the very fabric of the judicial system and undermine the constitutional doctrine of separation of powers.
This implied power to order compensation stems from the authority of every court "to control the proceedings before it insofar as the essentials of the judicial process are concerned." (People v. Burke (1956) 47 Cal.2d 45, 52 [301 P.2d 241].) A lawyer whose appointment is required under the mandate of Payne is such an essential part of the judicial process. It is a means necessary to carry into effect the very jurisdiction of the court. (See Code Civ. Proc., § 187.) Even if the duty to represent indigents be considered an incident of the license to practice law, the power to deal with the subject lies in the judicial branch. (See State v. Rush, supra, 36 N.J. 399 [217 A.2d 441, 447].) If the appointed attorney becomes insolvent because of the appointment, the judicial system is weakened.
Since the Payne decision, appointed counsel is an integral and necessary part of the civil trial. Consequently, the trial court was empowered by the Constitution itself to order payment of fees and expenses. (See Board of Supervisors of George County v. Bailey, supra, 236 So.2d 420, 423-425 (dis. opn. of Inzer, J.).)
While there may be better ways of handling disputes than we presently provide in our system, so long as we have courts, advocates remain an integral and necessary part of the system. Contrary to the views of some *209 people, lawyers, while they are committed to public service,[12] are not public utilities.[13]
Many cases in the criminal field talk of the attorney being an officer of the court. This may be so. However, such a concept should not be used to blind oneself to the fact that while an attorney may be the officer of the court, he is not a public officer. (See In re Galusha (1921) 184 Cal. 697, 698 [195 P. 406]; McKannay v. Horton (1907) 151 Cal. 711, 721 [91 P. 598]; Ex parte Gregory Yale (1864) 24 Cal. 241, 244; Cohen v. Wright (1863) 22 Cal. 293, 315.) In fact, if the attorney were a public officer, he or she would be paid by the government.
Concluding as I do that providing for compensation for attorney fees and expenses is required does not mean a quantum leap, but only an incremental change. (See dis. opn. of Kaus, P.J., in Salas v. Cortez (1978) 80 Cal. App.3d 427, 438-439 [145 Cal. Rptr. 727] which would have provided for appointment of counsel in a civil paternity suit (the compensation of such counsel not being an issue).)[14] The number of cases requiring compensation for private practitioners should quite probably be very limited in number for several reasons: (1) Payne itself limits the cases requiring appointment to situations where no other alternative is available; (2) to some extent insurance may cover some defendants; (3) a private practitioner need be appointed only in cases where there is no *210 other available source for counsel;[15] (4) where there is a relatively small expenditure of time or money in the particular case, counsel, in accordance with the tradition of public service, may, and should, waive payment; (5) there is a growing number of publicly or privately funded legal service groups which should be able to handle the bulk of the cases.[16]
The trial judge, in the proper exercise of his discretion under Payne, concluded that the appointment of counsel was necessary and ordered payment of fees and costs in this case. I would uphold that order and deny the petition for a writ.
On July 13, 1978, the dissenting opinion was modified to read as printed above. The petition of the real parties in interest for a hearing by the Supreme Court was denied August 24, 1978. Bird, C.J., was of the opinion that the petition should be granted.
NOTES
[1] In the Payne case the court said: "All we hold is that denial of appointed counsel to an indigent prisoner, when no other relief will preserve his right of access to the courts, is constitutionally impermissible. [¶] We do not rule that appointment of counsel is an absolute right." (Payne v. Superior Court, supra, 17 Cal.3d at p. 924.) We infer by the order respondent court made in this case that the court determined appointment of counsel for O'Neal was necessary under Payne to preserve his constitutional right of access to the courts.
[2] The three dissenting justices also recognized that the majority opinion mandates the rendition of free legal services. Their opinion states: "In the final analysis the majority will mandate the rendition of free legal service by the bar to convicted criminals in civil cases, which professional service we have not as yet required be extended to law-abiding citizens. The majority concede that we cannot compel appropriation of monies, legislative or otherwise, for these services." (Payne v. Superior Court, supra, 17 Cal.3d at p. 933.)
[3] We realize this may be due in part to the fact that Payne is apparently the first case which has held the appointment of counsel for an indigent imprisoned civil litigant is constitutionally compelled.
[4] In this regard the reliance of real parties in interest upon Luke v. County of Los Angeles (1969) 269 Cal. App.2d 495 [74 Cal. Rptr. 771] is misplaced. In that case Luke, an attorney, was appointed to represent an indigent defendant in a narcotics commitment proceeding to the C.R.C. pursuant to Welfare and Institutions Code section 3050 et seq. The court awarded the attorney $750 compensation which the county auditor refused to pay. In that mandamus proceeding the auditor was ordered to honor the warrant. At that time Welfare and Institutions Code section 3105 authorized the appointment of counsel for indigent defendants in C.R.C. commitment proceedings. It did not expressly authorize the payment of fees. Penal Code section 987a at that time provided for compensation in criminal proceedings. C.R.C. proceedings have been labeled civil in nature although they may result in involuntary commitment to an institution. The court framed the question thus: "Is it reasonable today to attach to a statute which provides for court-appointed counsel in a custodial proceeding an interpretation that appointed counsel will render his services for nothing?" The court answered its own question, "We think not." (Luke v. County of Los Angeles, supra, 269 Cal. App.2d at p. 499.) The court predicated the conclusion on the custodial nature of the proceedings and on a perceived legislatively declared public policy that counsel be compensated in custodial proceedings. The case at bench is clearly distinguishable because (1) there is no statute authorizing the appointment of counsel, (2) the proceedings are not custodial, and (3) there is no legislatively announced policy in favor of paying counsel in strictly private civil litigation.
[5] The law in California, as in many other states, has been changed since Rowe and Lamont by the enactment of legislation authorizing the appointment of counsel at public expense. Illustrative of these statutory provisions are the following: in criminal cases for indigent defendants (see Pen. Code, §§ 987.2-987.8, 1241), in juvenile court proceedings (Welf. & Inst. Code, §§ 317, 318.5, 634), in mentally disordered sex offender proceedings (Welf. & Inst. Code, § 6305), for narcotic addicts (Welf. & Inst. Code, § 3104), for the developmentally disabled (Health & Saf. Code, § 38451; Welf. & Inst. Code, §§ 6517, 6519), and the mentally ill (Welf. & Inst. Code, § 5365). In addition, the public defender has a limited duty to represent indigent defendants in civil litigation "in which, in the judgment of the public defender, the person is being persecuted or unjustly harassed." (Gov. Code, § 27706, subd. (c).)
[1] Reference to briefs or records in a prior case is a permissible method of ascertaining what issues were before a court. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 677, p. 4591.)
[2] In my opinion, the issue in this case is not primarily whether the indigent prisoner's constitutional right to access to the courts in a civil case will be significantly impeded if his counsel is not paid from public funds, but primarily whether or not appointed counsel is entitled to be paid. Simply stated, once the appointment is made, the attorney must either be paid or donate his services. I submit that in such a case the attorney has a constitutional right to be paid. It is an application of the fundamental fair play on which the constitutional provisions are based. I do not advocate that there be a public subsidy to the legal profession, but I do assert that simple equity requires public payment in those limited cases where private counsel is appointed.
[3] The literature and studies on the subject matter are now quite extensive, some since Payne. For some materials other than those cited hereinafter, see, e.g., National Commission on Criminal Justice, Standards and Goals, Task Force on Corrections 82 (1973); Comment, Current Prospects for an Indigent's Right to Appointed Counsel and a Free Transcript in Civil Litigation (1976) 7 Pacific L.J. 149; Comment, Resolving Civil Problems of Correctional Inmates 1969 Wis.L.Rev. 574; Cappelletti and Gordley, Legal Aid: Modern Themes and Variations (1972) 24 Stan.L.Rev. 347; Comment, Payne v. Superior Court (1977) 11 Suffolk U.L.Rev. 1159; Note, Payne v. Superior Court: The Indigent Prisoner's Right to Counsel in a Civil Suit (1977) 13 Idaho L.Rev. 415; Comment, Indigent's Right to Appointed Counsel in Civil Litigation (1977) 66 Geo. L.J. 113; Comment, Indigent Prisoner Defendants' Rights in Civil Litigation (1977) 90 Harv. L.Rev. 1029; American Bar Association Commission on Standards of Judicial Administration, Standards Relating to Trial Courts, Standard 2.22, Commentary 43-44 (1976); Note, Attorney and Client  Compensation of Trial Counsel Appointed For Indigent Defendants (1961) 49 Cal.L.Rev. 954.
[4] The indigent prisoner in this case may be judgment proof at the present time. However, he faces a possible lifetime of periodic judgment debtor examinations and renewal of the judgment. Complex legal issues may also be present and possible bankruptcy law questions dealing with nondischargeability will result in additional work on the part of counsel.
[5] Arguably, the petitioner county has in fact acknowledged an obligation to compensate counsel by entering into a contract with Fresno Legal Services to provide legal services to indigents. Since Fresno Legal Services was not eligible to represent this defendant because of a conflict of interests, the appointed counsel might be considered to be a substitute for legal services or in the nature of an assignee. By the contract, the county has recognized a responsibility and provided funds for indigent representation. However, we do not have that contract before us and, thus, cannot consider that possibility.
[6] (See also, Finch, C.J., dis. in State v. Green (Mo. 1971) 470 S.W.2d 571, 576: "What reason is there ... that attorneys should be asked or expected to assume this heavy burden and serve without compensation and at their own expense? I perceive none." See also Hunter. Slave Labor in the Courts  A Suggested Solution, supra, 74 Case & Com., at p. 12: "Simple justice indicates that a government that has decreed that an indigent defendant has a right to valuable services has the corollary duty to provide the compensation for such services.")
[7] The lead opinion, in distinguishing the position of an attorney from that of other businesses or occupations, because of the Business and Professions Code obligation, correctly points out that no such statutory or professional obligation attaches to those who perform other businesses or services. If comparable statutes applied to other businesses, occupations or services, the same constitutional rights discussed herein would also protect their property.
[8] At common law (and until 1836 in England) a felon did not have a right to counsel except as to points of law. (Betts v. Brady (1942) 316 U.S. 455, 465-468 [86 L.Ed. 1595, 1603-1605, 62 S.Ct. 1252].) A felony entailed loss of life or limb and confiscation of goods of the felon, and by "corruption of blood," the felon was legally incapable of granting property to heirs or receiving property from ancestors.
[9] This compensation would, of course, be limited to a reasonable sum and need not be fully comparable to what the attorney might receive representing a nonindigent. (See State v. Rush, supra, 46 N.J. 399 [217 A.2d 441, 448] using a 60 percent figure; see also Pen. Code, § 987.3, listing factors to consider in criminal cases.)
[10] In passing, and with no desire to overstate the matter, I admit that it is difficult conceptually for me to understand how the right to waive court filing fees for indigents in civil cases such as Earls and Ferguson (Earls v. Superior Court (1971) 6 Cal.3d 109, 113 [98 Cal. Rptr. 302, 490 P.2d 814]; Ferguson v. Keays (1971) 4 Cal.3d 649, 652 [94 Cal. Rptr. 398, 484 P.2d 70]), which are fees set by the Legislature, can be squared logically with a denial of the power to pay counsel. Although there is an obvious distinction between not receiving fees and expending funds, it still comes down to the same question of the power of the judiciary to act.
[11] As, e.g., was done in People v. Randolph (1966) 35 Ill.2d 24 [219 N.E.2d 337, 340].
[12] The legal profession has been described as "... a group... pursuing a learned art as a common calling in the spirit of a public service." (Pound. The Lawyer From Antiquity to Modern Times (1953) p. 5.) The extent of pro bono work done by attorneys often goes unrecognized. Many attorneys do indeed render services without a fee or for a reduced fee. (See, e.g., Maddi & Merrill, The Private Practicing Bar and Legal Services For Low Income People, American Bar Foundation (1971).) The need for greater availability and visibility of service, as well as uniformity of eligibility standards produced legal aid offices and the Office of Economic Opportunity funded facilities. Meanwhile, pro bono programs of the private bar also continue to expand.
[13] Moreover, even public utilities are entitled to a just compensation and are not obligated to provide their services for nothing. Attorneys for legal service groups receive a salary, low though it may be. Even galley slaves received food and lodging.
[14] The impact of legal rules on the public treasury is a proper consideration. However, we must follow the constitutional mandate and we should not permit ourselves to be paralyzed by the "where will it all end" syndrome (see dis. opn. of Kaus, P.J., supra, at p. 439). Payne does not extend to plaintiffs. The Supreme Court stated in Payne, at pages 926-927: "... we emphasize the limits of our holding. We have not ruled that all indigents have the right to counsel in civil cases. Nor have we established that indigent prisoners who are plaintiffs in civil actions may secure appointed counsel or the right to appear personally. [Citations.] Neither of those questions is before us, and we do not resolve them here." (Italics added.)
[15] While the growing number of legal service groups will undoubtedly reduce the number of private counsel who will be appointed in these cases, there will be a few appointments of private counsel. The instant case is one of them. There is no challenge in this record of the need to appoint private counsel and there is no abuse of discretion in such appointment. (See fn. 1 of the lead opinion.)
[16] Some of these are even specifically designed to provide counsel in civil cases for indigent prisoners (the Federal Law Enforcement Assistance Administration has made money available for such purposes and the State Bar of California is a grant applicant with a nonprofit corporation to be formed to run the operation. Similar programs are operating successfully in New York, Texas, and Massachusetts). (Los Angeles Daily Journal, June 12, 1978, p. 1, col. 7.)